versus Westchester County at all, and New York City Police Department at all. I just want to make sure we're not distracted by people leaving. Yes, sir. All right, I see you reserved two minutes for a rebuttal, and you can begin whenever you're ready. Thank you. Good morning, Your Honor. My name is T. Edward Williams. I represent the appellant, Ibrahima Diallo. Before I get to the presentation, I just want to sort of introduce Mr. Diallo to the court so the court has an understanding because they impact the facts. Mr. Diallo is about 5'6", weighs somewhere in the neighborhood of anywhere between 125 pounds and 130 pounds at the time of the incident. The incident is that the allegation in the criminal court was that he was among three or four individuals who committed armed robbery at some point, I believe it was in 2008, and they did not move to prosecute until three years later. So that's his profile. Rather small, frail individual, suffered from tuberculosis of the spine and really could not have taken on or carried out any of the activities of which he was accused. The issue before this court is really two straightforward, or what I thought were straightforward issues, one having to do with probable cause and whether sufficient allegation has been made to overcome the presumption created by the indictment, and the other related to whether a picture supplied by the New York City Police Department represented that, representing Mr. Diallo to be a criminal and that he would have participated in the event, in the robbery, whether that constituted a statement. On the issue of probable cause, let me just ask you, I know you have some allegations in your complaint and your proposed lamented complaint regarding the meeting with the prosecutor and the disclosure of some of the things you're talking about in terms of his medical condition, his accent, his cell phone records to try to show he couldn't possibly have been him. But with respect to the securing of the indictment, it's not clear to me that the officers who interviewed the eyewitness and showed the eyewitness the photo array would have been aware of those things. So how could that be a basis for overcoming the probable cause for the indictment? I understand you have other allegations. Yes, sir. But can we take those when they were disclosed apparently to a prosecutor in a meeting and then the prosecutor ultimately, I think, shortly thereafter dismissed the case, right? Well, no, not shortly thereafter. How did the police officers know they had a medical condition when the case was put into the grand jury? How would they know that? All they had was a photo. So if the first part of your question, Judge Bianco, goes to this notion of disappearing probable cause, which is handling the brief. But if we step back before, they knew they or anyone who would have conducted a proper investigation would have known that. I think that's different. The proper investigation part, I think you know, our law is clear that if you have an eyewitness, they don't have to go around and check and corroborate the eyewitness unless they have reason to doubt the veracity. So even though they could have done things to look into your client, the law doesn't require them to do that. But if we would just take what the basis was for the indictment, it seems pretty clear it was based solely on the eyewitness testimony, correct? That was corrupted by the fact that he was the only Guinean. Right. I understand that. How do you know, I know you alleged this, but how do you know that they told him that your client was from Guinea? We got that from the file that was turned over by criminal counsel much, much later in the process. But as we began to go through the file that Mr. Diallo's criminal attorney had, I don't know if it was through a discovery or that he had done some work on his own. We also spoke with the victims, Richard Ferraris, who was a DJ, and one of his friends who supplied information about what they had presented to the police and what they had been told about it and who felt badly about what had happened subsequently to Mr. Diallo that he had been wrongly identified. So the tissue report says nationality is an invisible attribute and so it doesn't make the thing suggestive. So what would the victim making the identification do with the information that the person is a Guinean? Are you saying, we don't have, I didn't find the photo array in the record, so I don't know what it looked like. Would the victim looking at the photo array know that there's only one Guinean in the  Yes, yes, and here's why. How would the victim know that? The victim would know that by the names. The only name, Ibrahima Diallo, in the lineup that signed remotely Guinean So you're saying the photo array had not only photos but names of the individuals? It had the names of the individuals. So the one I, for example, Sean Carter, who was clearly an African American male, you know, all of them, all the five, they call this a six-pack in criminal court, all the five had regular Western American type names. Well, I thought you were alleging the other five were white, right? Aren't you alleging the other five were white? No, no, no. No? They weren't white. They had Western names. That's the allegation that goes to this.  I'm going to read the court just from the record, SBA 25. Furthermore, plaintiff's allegation that the victim knew he was the only Guinean in the photo array also fails to prove bad faith because he fails to explain, one, how nationality would have been identifiable in the photo array, and, two, how informing the victim of plaintiff's nationality, an invisible attribute, is a bad faith. Well, that to me sounds like it could have been written as a contention interrogatory in discovery, and he would have then had to have disclosed properly how he knew this information. At the motion-to-dismiss stage, the Court should have credited Mr. Diallo alleged enough factual material that the Court should have credited this statement and drawn inferences from it. Also, just looking at the motion-to-dismiss standard, when there is asymmetry of information, in other words, the defendant is clearly going to have more information in this instance than what the plaintiff is going to have. I don't know. I mean, I don't think that it's improper for a district court to say on a motion-to-dismiss that you allege you're the only person of a particular nationality, but that doesn't tell me how the victim could have identified somebody by that nationality. But now you're saying that the photo array included not just the photos but also the given names of each person in the array? That is correct. How do you know that? Is that in the record? This is what we saw, and this is what we're trying to plead. We got a file. You saw the photo array? I did. We got a file from the criminal attorney very late in the process, and we were trying to plead, amend to plead it to add additional allegations later on. That didn't happen. I want to turn quickly just to the City of New York and their allegation that they did not initiate the prosecution. They cite to the Rahman case. I think this panel knows well that it's the Rochessi case. Before you go to the City, you also made an allegation that the video shows that your client was not one of the robbers, right? That is correct. So my understanding from the – how can you tell from the video that it's not him as opposed to it being inconclusive? Well, he's a very slight individual. I mean, the other individuals who were involved in this, most of whom I – you know, I don't think all of them were Ghanaians, but the other individuals involved are really sort of built up. So you're saying based upon his stature. Based upon his stature. There's no way – Are you alleging that the police had that video at the time of the indictment? They had it the very – I believe within one week of the incident. But they thought the video was too grainy to conclude anything about the perpetrator from the video, right? Well, that's what they thought. But if I can look at the video and surmise that – well, I mean, look at these individuals. And then someone you bring in for – after you arrest them, you bring them in and this person is a slight individual who – What about the issue about the victim saying that the assailant in the khaki pants had a mask or didn't have a mask? How does that play into it? Yeah, that's a curious statement, but I think it goes to the lack – What does the video show? The video does not – the allegation – or the statement made by the witness is he had a camo pants on. The video – and the way I see camo is sort of a fatigue, green, black type deal. The video doesn't show that kind of detail as to what they were wearing, which makes clear in my mind – What does it show about the mask? There are individuals wearing black masks, but apparently the witness testified that Mr. Diallo was an individual not wearing a mask. So apparently that's how they were able to identify – but again, if you look at the video, all individuals are wearing masks. There's no way for this witness to identify anything. At the inception of the investigation, if anyone would have gone and just spoken to Mr. Diallo, they would have saw that he's an individual who could not have committed a crime. But that's not what – we're not saying bad police work equals our claim for malicious prosecution. That's not what we're saying. We're saying there was no way there could have been probable cause asked for Mr. Diallo other than the fact that he is a Guinean black individual. If he weren't that, those sort of national characteristics, he wouldn't have been involved in this case whatsoever. And that information I think the Court just skipped over. It didn't, you know, in my view, didn't really engage the case at all. There was evidence that there was – there were Guineans who had been committing crimes, right? Like it's not a coincidence that he's Guinean. They didn't want to victimize a Guinean. And there was a reason to think that there was somebody who was Guinean, right? No, because what the complaint alleges was that there was one individual, Moussa Krubeli, who is Guinean. And New York City assumed because there was one Guinean involved. They supplied pictures when asked about Westchester County. They supplied information about five or six Guineans who they suspected may have been involved. That's the allegation. They suspected they worked together. Yeah, that they were sort of – they all ran in packs, so to speak. So if the description of the perpetrators matches the particular nationality, it's not discriminatory to look for a suspect who matches the nationality. It's discriminatory. But you're saying they basically rigged the photo array. They did. That would be a problem. From the get-go. It's not that somebody matches the description of the suspect. There was no description. The only thing that prompted the City of New York to supply the photo of Mr. Diallo was the fact that he's black and that he's Guinean. If his name was something different, Billy Budd, whatever, he would not have been in this trouble whatsoever. That's the only reason they included him in this. I thought it had something to do with the license plate, too. But the license plate was from New Jersey. He lives in Yonkers or rather the Bronx, New York. Doesn't drive. Can't drive. I know. But they – I thought they had the photos in connection with that. They did not. All right. All right. Let's hear from them. All right. Thank you. Good morning, Your Honors. Justin Aiden for Westchester County Police. So many of the things Mr. Williams just mentioned in his argument are facts that are not alleged in any of the three, the original, the first amended, or the proposed second amended complaint. There is no allegation anywhere that the photo array displayed names. In fact, the only information about the photo array comes from Exhibit 1 to the complaints, which was the affidavit from the prosecutor that on page A83 they referred to as double blind photo arrays. And normally double blind photo arrays, the person looking at the arrays doesn't see names. There are names hidden so the police afterwards can see who the photo is when somebody is identified. But there's no – If it's a double blind photo array, it would not have presented the names to the victim. Correct. And there's no allegation – We just heard that Mr. Williams saw the array and it had names. I don't know. You're just saying that that can't be right. No. Because afterwards, once you have an indictment, what the victim sees when they're making the identification and what's turned over to a defense attorney is separate. So they would have turned over the photo array that would include names, but the victim would not see the names. Correct. When they do the identification. Okay. Correct. They're put into a folder that kind of holds – that just shows the pictures. And there's no allegation that Mr. Rosa ever saw the names when he was doing the photo arrays. There's also, even about some of these physical characteristics of Mr. Diallo, there's no factual allegation anywhere that – Why would – putting aside the array, why would the officers tell the victim the nationality of the alleged perpetrator in showing an array? Isn't that in itself suggestive of bad faith? Like, you would never tell a victim what the nationality was before they looked at an array, right? I'm not sure why the Yonkers police officers did that. But it is as – That would be improper, right? In a police procedure, to tell someone you're showing a photo array, the race, nationality of the person is X, right? Potentially would be. I would note that it was no officer of Westchester County that did that. This was City of Yonkers Police Department, as identified. In terms of whether or not he has plausibly alleged enough to suggest – to overcome the presumption, that would suggest bad faith. I know there may be issues about what the array did or did not show in terms of names, but certainly that's an allegation. And I know it's not – I mean, it isn't a complaint that that's an allegation, but he says the victim told him that the police said that. It's pretty problematic, right? I don't believe that actually ultimately is problematic for a couple of – Well, it's problematic. I mean, I take it – I mean, we've said in cases that the officer should not give information to the witness about the defendant, but that it only renders the array unduly suggestive if it prejudices the outcome, right? So you're saying – I guess I take it you agree with the district court that being Ghanaian is not – like, it's not apparent from the photos who's Ghanaian and who's not, and so therefore it was still a reliable identification. Correct. And, you know, frankly, there's the other fact that Rosa identifies two people in the arrays. There's an indictment. Grand jury – you know, Rosa testifies at the grand jury. Grand jury believes that, so you now have an indictment and you have probable cause from the indictments. What about the proposed allegation that the Westchester County Office of Detectives knew there was a video of the crime and that he did not appear in the video? What should we do about that? Well, again, that doesn't matter. Once you have – if you have an eyewitness and the grand jury, you have an indictment from the grand jury, you have probable cause. The fact that you – But the video is something that the officers did have at the time of the arrest, right? They had seen the video. They just decided it was inconclusive, right? Yes. The Yonkers officers had the video. So if it were obvious from the face of the video that it couldn't possibly be him, that might dissipate probable cause, right? It would depend. So they would have to provide that video to the prosecutors. Ultimately, it's up to the prosecutor what to present to the grand jury, which is entitled to absolute immunity. The grand jury issues an indictment. You do have probable cause from that indictment. And I would say you actually do have – But we don't know whether they even gave the prosecutor that video, right? That's part of the problem with a motion to dismiss. We don't know what the detectives did or did not do with that video, right? How do we know that? I don't know. I do not believe that is in here, whether Yonkers provided it to the grand jury. They gave the video to the prosecutor before the decision to indict. Well, I don't know. But it doesn't actually matter. It's completely exculpatory. Wouldn't it matter? Like, let's say you saw the person's face very clearly, and it definitely wasn't him on the video, and they had that evidence. Wouldn't that matter? If it was clearly – I mean, I kind of expect you to say that it is inconclusive. But now you're saying it doesn't matter if it were inconclusive. So maybe you should just focus on whether the video actually does show that it couldn't possibly have been this defendant. Yes. I'm trying to say, yes. It doesn't matter because the video was inconclusive in this case whether they actually – whether there's an allegation that they provided it or not. Whether if it was – We have no idea whether the video was inconclusive or not. All we have is an allegation that it could not be him based upon the video, right? That's all we have at this point. Right? We don't have the video. So we don't have the video, but I will say – What about the fact that there appears to be the first statement from the victim that is that the person who you later identified as the assailant, Mr. Diallo, was wearing a mask at the time. Isn't that also something that enters the mix? That's a question – He testified before the grand jury, and so that's a question of what did the grand jury ultimately indict on. That is not relevant to whether the police had probable cause. We don't know what he said. You know, he told the police initially he had a mask, and then later on we're told that he identified him in a photo, right? We don't know if the grand jury was told the inconsistent statement that initially he thought he had a mask on, right? We have no idea what the grand jury was told. But neither do the police in executing the warrant, because these claims come from his arrest. But if the police knew he initially said that he had a mask on, the law is if there's probable cause, unless there's something that undermines the veracity of the eyewitness. So if the eyewitness initially said the guy had a mask on, doesn't that undermine, to some extent at least, the credibility of the witness if he later says that's the guy? It can – it's something that might have to be weighed, but I will say that what subsequently should be weighed as well is the fact that the eyewitness identified two people. Prior to Mr. Diallo's arrest, the other individual was arrested and pled guilty. So the eyewitness got it right with at least one of the, you know, with one of the two identifications at least. And whether the witness is credible or not, that's a factual inference. But usually if the victim says that he can identify the person, that is usually enough for a probable cause.  And then once – and particularly here, you have not just the initial identification. You have the grand jury indictment. Well, the grand jury indictment is based on the victim identification, right? Was there other evidence presented to the grand jury? Mr. Rosa, was the only witness who testified before the grand jury? We don't even know whether the grand jury was shown the array. The proposed allegation suggests that he just said Diallo was the one who robbed him and just said the name and that there was no – nothing beyond that. That's what he's alleging. But that may be enough for a grand jury to indict, and that is enough for a presumption of probable cause. Those things went on behind the scenes that undermined that testimony, right, that the police may have been involved in. That's the whole point of their allegations. But, all right, let's hear from the city. Thank you. Good morning, Your Honors. Shane Magnetti for the City of New York. This case arises from a robbery that took place in Westchester County and for which a plaintiff was prosecuted by Westchester County. The district court properly dismissed the plaintiff's claims against the City of New York, which was very minimally involved in his arrest and not involved at all in his prosecution. Starting with the false arrest claims, NYPD participated in plaintiff's arrest in Bronx County with police officers from Westchester pursuant to a post-indictment warrant. The complaint does not allege that the warrant itself was facially invalid. It does not allege that NYPD was involved in procuring that warrant, let alone by fraud or misrepresentation. Therefore, NYPD was entitled to rely on the warrant, which provided probable cause for plaintiff's arrest, and that is a complete defense to his claims as against the city. As for his malicious prosecution claim, the district court properly dismissed that as well because the plaintiff was not prosecuted by the City of New York. He was prosecuted by the Westchester County District Attorney's Office. The complaint does not allege that the city did anything other than send photographs of suspects from similar pattern robberies to Yonkers detectives at their request. It does not allege that the City of New York generated witness statements or was in touch with the prosecutor or anything like that about the decision to inform the prosecution. Therefore, that claim fails at the outset on the initiation prong. Did they help the county, though, by linking it to the New Jersey license plates? Well, all they did was respond to an email from Yonkers detectives who had reached out to them and said, We have a robbery in Yonkers. We suspect that the perpetrators were a Guinean. And then if you look at page 277 of the complaint, it alleges that NYPD simply sent suspects in similar pattern robberies that used a vehicle with temporary New Jersey license plates that met that description. But that's not the same thing as making the probable cause determination here or giving a victim a photo array that included plaintiff. So it's a couple steps removed from the arrest here. And I'm not aware of any case which would hold that mere information sharing between law enforcement agencies is enough to give rise to liability for false arrest. So as for the selective enforcement claim, I think the district court properly dismissed that as well. To plead a selective enforcement claim, plaintiff was required to establish that he was treated differently than other similarly situated individuals for an impermissible reason such as race. And the complaint does not include any allegations about any comparators. And the district court correctly concluded that his allegation that if his name was John Smith, he would have been treated differently, was too vague, too conclusory to serve as a viable comparison. Well, for somebody who's Guinean, it's plausible that they wouldn't have arrested somebody named John Smith, right? But you would just say that that's justified. The relevant comparator would be if they got information that, you know, the perpetrator was Italian and they ignored all sorts of Italian suspects or behaved very differently in that kind of a case. That would be a comparator, right? Is that how you think the analysis would go? Yeah, I think it would go something like that. And I think the problem with the allegations here is that John Smith is a fictitious, hypothetical individual. The complaint does not explain how he's similarly situated to plaintiff in this case. And even beyond that, I think part of the analysis about how his heritage factors into the investigation here, I think this court should look to Brown v. City of Oneonta, which held that race is a permissible consideration in an investigation when it is used based on the description of the perpetrator. And really that's all that the city did here. It was NACRA's detectives who reached out to the city claiming that there were Guinean suspects involved in the robbery. The city merely sent photographs that matched that description. And if I could briefly touch on the stigma plus claim, the district court correctly dismissed that as well, simply because there's no false statement alleged in the complaint. Plaintiff's theory is that the city sent this photograph of him that was intended to make him look like a criminal because he appeared disheveled and not clean cut. There's no allegation in the complaint that the city doctored this photograph or altered his appearance or did anything that would make him look different than he otherwise would. If you had a selection of different photos you could pick, maybe the selection of a photograph might be discretionary on the part of the city. Sure, but even then there's no allegation in the complaint that that's what happened here. And even if this could be construed as a false statement, the defamation claim also fails because the complaint does not allege the existence of a material state-imposed burden. It simply alleges... Doesn't the complaint say that the reason they did it was so that they could put him in jail, which they did? Well, are you asking about material state-imposed burden? Yeah. So if you do the defamation and the defamation is used to support an arrest, the arrest might be a material state-imposed burden. Might it not be? I don't think so in this situation because under these circumstances it's not NYPD who made the arrest and there's no way they could have predicted that this photograph would be used in a photo array or that he would in fact be the one identified. But he looks, if they're alleging he looks disheveled and he looks like a criminal, isn't that falsely representative of his appearance? No, this is a picture of plaintiff. There's no dispute that it is a picture of him and there's no dispute that NYPD did not do anything to change his appearance in that photograph. There's also no allegation that they could have chosen from other better photographs of him. We don't even know if there was a discretion. And also I guess if you choose among a number of photographs even if you do have some discretion, like you're not really making a statement about the person or if you were it would be an opinion about what is the best photograph to use for these purposes. Sure, but we don't even have that in this complaint. So for all of those reasons, I think the complaint was correctly dismissed as against the city. I'm happy to answer any other questions you may have. Thank you. Okay, Mr. Williams, you have two minutes in the file. Yes, Your Honor. Just briefly following up on the stigma plus claim. The cases that we cite in our brief I think are exactly on point as to when someone is defamed and then what subsequent action comes forward. We have. They rely on the Paul V. Davis case as to we. But it's a genuine photo, right? They didn't doctor the photo. I don't know if they doctored it. Okay, but it's not alleged that they doctored it. I mean I guess you're speculating about maybe they doctored it, but there's no allegation that they doctored it. There's no allegation. You can't tell from the face of the photo that it's not an accurate depiction of him, right? I'm sorry. You can't tell from the face of the photo that it couldn't be an authentic photograph that it's not doctored. I couldn't tell, no. But part of the questions the panel asked goes to why there should have been discovery in the case because we have put forth a plausible case that if true would result in liability. But as we're progressing. I mean it is true that if it were doctored, maybe there would be a problem there. I don't even know if that's defamation or some other problem, but there might be a problem. But you just don't know. So that means that you don't have a plausible allegation that that's the fact. Well, we don't know at this stage, but what we do know is that a picture of a non-criminal. Can I just ask about the photo array? Yes, sir. So opposing counsel was just pointing out that, yeah, we do know the names of the people in the photo array, but the nature of a double-blind photo array is that we don't show the names to the victim. The only thing we have in the record is that it was a double-blind photo array. So why should we conclude that the names were in front of the victim? Well, my understanding from the criminal attorney who was involved is that's not accurate. And the fact that they're raising that young person. If in discovery you got the photo array and had the names on it, that doesn't necessarily mean that that was the way it was shown. That just may be how they produced in discovery, right? Well, the fact that the criminal attorney, quote, unquote, told you that, I don't know what you're suggesting. Told you what? Well, I'm suggesting it is an allegation at this point that we should be allowed to pursue to see exactly what happened. You could have put in the complaint and the victim saw the names and they were a different nationality. Well, we tried to do that at the later stage because we didn't get the file until much later, until after the second amended complaint. We tried to do that, and the district court denied leave to amend. I thought the one that you proposed didn't have that in there. You're saying after that? Yes. We had obtained the files. So counsel sent me the files in sort of, I think, three or four batches. The sort of last trove that we got had a good bit of good information, and then we moved to amend. How do you know from the last trove that the victim was shown the names? How do you know that from the last trove? Because I had that discussion with the criminal attorney. All right. Well, if we were to move, obviously, if we were to move to discovery, we could learn a lot more about it. I'm suspect about the fact that someone calls up and say, we have at least one Guinean who committed a crime, and then the city of New York says, I'm sending you six pictures of Guineans. All right. I mean that. We understand the arguments. We appreciate everybody coming in today. Thank you for the reserve decision. Have a good day. Thank you, Your Honor.